This is a diversity case from Idaho concerning the esoteric rule of quasi-estoppel as developed in the state of Idaho and as applied in this case. We would suggest three things in this case. We may try to make three points if we may. Number one, that the court below was correct in determining that the anti-assignment provisions of the settlement agreement entered into by Pamela Short at the time of her injury was valid. That is, it could not be assigned. Number two, we would suggest that this court below misapplied Idaho's rule or law of quasi-estoppel when it concluded that notwithstanding the invalidity of the assignment, that the assignor, Pamela Short, could not keep the monies that had been provided to her by Singer Finance Company and assert the non- or anti-assignment provisions. Number three, the point that we would urge is that the court below erred when it concluded under Idaho law that this was a commercial transaction case and awarded attorney's fees to the prevailing party, Singer Finance, at the conclusion of its decision herein. Tell me, on what basis advise your client to keep that money? What was it, $35,000 or $24,000? $35,900. $35,000. That's the money she got from Singer. That's correct, Your Honor. Why wouldn't you just tell her to give it back and argue that the assignment was void? Give them back their money. Huh? Why not? She gets $140,000, then, if she gives back $35,000. That's her money. The record is not complete in that regard. I mean, they tried to take advantage of your client. Now you want to take advantage of them. Is that it? I think that that's the way the court below perceives it, and it might appear at first blush that that's the case. However, the record is far from complete, Your Honor, that she had the capacity to pay the money back. She had the capacity to spend it. And, indeed, she had, Your Honor. If she could pay it back, she had one payment that was due here. What was it, $31,000 or? $33,000. $33,000. So that wasn't too far off. That was due three years ago. It was due in 2001. 2001. So has she gotten that money? She has part of it. Part of it. Well, then you're just going to have to loan her the rest. That's all. I see. Or maybe she could sell part of the rest of it. I don't know. I don't think she can sell part of the rest of it. Well, and so we would say what your Honor's question goes to is the heart of the matter. Is it fair? Is it unconscionable? We're suggesting probably that they took advantage of her. Should she now be able to take advantage of them? I don't know that I. You know, any time you want to claim fairness, I mean, you have to put the same burden on yourself. You have to weigh the equities and balance the equities. I understand that, Judge Callahan, that the proposition that we would urge is that there was none of that weighing that took place. What is unconscionable here is fact-driven. And that might be that she could pay all or part of it back. But there was never a factual determination in that regard. We never got there. The Court, like most of us, being ethical, moral people, said, wait a minute, she shouldn't get away with something. But don't we have to inquire as to her capacity to pay it back, whether she can pay it back? Don't we have to weigh the equities? How much money she got? How much does she have now? Yeah. There's about $28,000. She's got that in the bank, huh? Yes. She's got that to pay it back, can't she? Well, what does that do with the other $7,900? Take a note for that, you know, for the that plus interest. You know, at half percent, you know, that's a going rate, isn't it? So it's due in less than two years. It may be that that might be a result that might make it, Your Honor, except that if you note that the second amended judgment in the case gives them a judgment for the $35,900 plus interest, in addition, they want their cake and eat it too. They also, in that judgment, get the 2006 and 2011 payments. In addition, they get attorney's fees and costs. And the consequence, if you add all of that up, is I would guess that the legal rate of interest, no other incomes available to her, that if that stands, the likelihood that she ever receives any more of this stream of income would be limited because the time value of the money would eat it up. Yeah. Well, they're not going to get any future payments, are they? Under the second amended judgment signed by Judge Rafita, yes, they get the excerpt of record, Your Honor, and they got the $35,900 judgment plus the legal rate of interest. In addition, they got, the judge ordered that they receive the second, the 2006 payment, the 2011 payment. Didn't he give her the option to say, listen, you return the $35,900 and we'll put you all back where you were? And she'll get her end stream of payments and the company gets back its $35,900 and nobody gets any attorney's fees and everybody goes home happy. In the, it's not in the record and there was no hearing in this, hearings in this case. But at the time, at the time of the initial hearing on cross motions for summary judgment, the judge announced his tentative ruling that the, he was going to determine that it was, the assignment was invalid and suggested that, that she return the money plus a rate of interest to be determined. He thereafter asked the parties, what remaining issues are there to look at? And quite frankly, probably, Judge Pregerson, I violated the rule of pigs get fat and hogs get slaughtered. But. What's that again? Pigs get fat and hogs get slaughtered. I suggested. Where is that? That's in Idaho. That's a, that's kind of like quasi estoppel, Your Honor. I learned a lot from. But I suggested, he asked, what are the remaining issues in this case? And at that time, we had raised issues of the Idaho Consumer Protection Act, which went by the way. And I also suggested in a briefing to the, to the court that the remaining issues concerned how and why she should pay this money back, the circumstances of that repayment. And I suggested that if, if he had determined the contract was not assignable, it was void. And as between the two parties, whether it was uncautionable for her to retain the money under those circumstances, we raised that in our remaining issues argument. And as Judge T.G. Nelson would say, it doesn't pass the smell test. That's another Idaho. Let me ask you this. You know, this is all well and good about if we were handling a settlement conference. But we're here, you know, we're here in a court of appeal, and the parties have put certain issues on the table for us to decide. And while, you know, certain, while I might be sympathetic to certain things, you know, given another procedure. But here, essentially, you're asking us to, you want, you know, you, you want her to keep the assignments. You know, you're asking this court to, you know, I'm trying to say what remedies we have at this point. Because as parties, you put this in another posture. We're not at a settlement conference. You know, we're not talking pre-negotiations or anything along those lines. You've filed briefs. And the way I see it, I mean, you're asking, you want her to keep, you want her to keep the payments and not return what she's gotten and not pay attorney's fees, correct? That would be correct. All right. And the appellee respondent is saying, affirm the court, right? Affirm the district court. Affirm the district court as to the invalidity of the assignment. Yes. And determine that the court then shouldn't have applied for a number of reasons the notion of quasi-estoppel, not the least of which is the burden and the pleading. Right. And also that they're entitled to attorney's fees. And that they're entitled to attorney's fees. All right. And so all these other things that we're talking about, you know, albeit had we been in another posture, might be good things to talk about. But I'm sort of seeing it as I have a choice between your position and the appellee's position. Well, I think you do have that. I think you do have that. I mean, is there a legal choice of anything in between, I guess is what I'm saying, because that's what the discussion was about. And I might very well had I been the district court judge or had I, you know, been involved in some sort of negotiations. But I'm seeing it in terms of you both put this in a different posture before this Court. The alternative that I see, Your Honor, is that the possibility that this Court could conclude that she, that the record as to unconscionability, the elements of quasi-estoppel have not been determined in a factual, on a factual basis, which they weren't. That's a case of it just doesn't smell right. It's Judge Nelson, it just doesn't smell right. But is that the functional equivalent of findings and a legal determination that it doesn't smell right, that she should be estopped? And that factual determination was not made. Judge Rafiti took a whiff of this and said it didn't pass the smell test. He didn't determine whether on a weighing of the equities between these two parties, whether it's unconscionable for her to keep the money and retain the benefit of the bargain that she entered into. To sort of punish them, huh? Pardon? Punish them. To punish Singer. Well, I don't know that it's punishment. To punish Singer for taking advantage of this poor woman. Well, I'm not sure that I would agree that it's punishment, but I don't know that it's not like another Idaho expression that once in a while, you know, if you get a schoolyard bully, once in a while he gets his comeuppance and we say it serves him right. And in this case, that might be apropos, too. That Singer knew what they were doing entering into this agreement. That's why I expect that they can justify or rationalize somehow a discount rate of 18 to 25 percent, whatever this would amount to. And they knew that the agreement was that she wasn't supposed to do it. They did it anyway. There's a plethora of cases around the country where they entered into like kinds of arrangements and dealings. And so they knew what they were doing. So maybe punishment's not a bad idea as between the two of them. And if she had $35,900 and that would end it, that might be a result. And that might be a nice thing. But there was no determination that she had the capacity to write that check for $35,900. The court below did not say write the check for $35,900 and this will all go away. That was a tentative ruling. And then he reexamined the issues. And so she was never, it seems to suggest, the record seems to suggest that she was given that option. But I'm not, other than. I know, but a lot of times what happens when people are negotiated in the posture as they approach trial or like in a criminal case, maybe a person had an opportunity to take a certain negotiated plea. Then they go to trial and then they're convicted and they get a different sentence. And they want to go back to what they could have done before, short of an adjudication. And here, maybe she had certain options prior to the court making its decision. But once the court's made its decision, then we're stuck with the decision and then we've got to review it on appeal. And so, you know, I don't see how we can go back to what could have, should have, would have because we all didn't. But you can go back, Your Honor, and you should go back to what was. And could have, would have, should have. Judge Rafiti never wrote an order saying you shall return the $35,900 and I will declare this invalid. And that's the end of it. Well, we say that he should have. That's what the order should have been. That, yes, this is a void contract. And she may disaffirm it, if you will. I guess that would be avoidable. It's just plain void. And if she gives back the $35,900, then she's entitled to all the payments. Now, if you get that kind of a judgment, I mean, you know, from us, where does that leave you? I mean, that's kind of puts you in the position, it seems to me, if this outfit was dealing with a minor and they knew the person was a minor and they gave them the money, and then they found out, well, they knew he was a minor all along, and so they couldn't take the benefit of the contract, so they don't get the benefit of the contract. But at the same time, if the minor got a hunk of dough or if he got a Picasso painting and he's sitting there with a Picasso painting, smiling and laughing at him, he's going to have to give back the Picasso painting. So, you know, I don't see anything particularly unusual about that. And that might be a decent result. All I'm saying, Your Honor, is that that was never given to her in that form. I'm sorry. I sort of hear the thing, well, that may be a little cracker barrel. And then I might be put in a position, then, if we have $28,000, then I might be in a position of trying to loan her the remainder, Judge Progerson. But we were never given that option. That option went away very quickly. It was tentatively announced, then he asked for a further ---- Are you arguing that's not an option that's still available in the case? I think it might be. I think it's an option that's available. Let me ask you a question about, all right, this is Idaho law controls here, correct? I would urge that it is. All right. As far as I can tell, the Idaho Supreme Court has approved the quasi-estoppel doctrine. What we're talking about here is the distinction between whether one has a right or one has the power to assign a settlement. As far as my research indicates, I don't see that Idaho law has provided us any guidance on that or that there's any case law in that area. So if we go there, it would seem to me I'm concerned about the fact that this is an issue that would better be left to the Idaho legislature to make a determination about that than for the ---- I haven't seen anything. Can you point me to anything in Idaho law that talks about one's right and one's power to assign settlements? No. And we argued this below, and I think it was a case that hadn't been decided in Idaho before, and that was Judge Rafiti's review of all the other cases from around the country, and that was the conclusion he came to. But there are no Idaho cases on point. Idaho has adopted the Structured Settlement Act, which now prohibits those kinds of assignments and requires judicial approval. And the Federal Government has them as well. Let me ask you a question. I'm curious. Now, this is a diversity action, right? And how do you meet the minimum requirement of $75,000? Because the amounts at issue in the stream of payments were well above $75,000. How? Well, she assigned payments of $140,000, more or less, three payment streams that she assigned. Don't you have to look at the present value of what she assigned? I ---- We didn't compute that, Your Honor. I'll reserve my remaining 53 seconds. I computed it and barely make it. Thank you, Your Honor. May it please the Court. My name is Ken Nyman. I represent Singer Asset. I'm just going to jump into the middle of the discussion, or where I think it is. Essentially, Pamela Short made this deal. She received money for the deal, $35,900. She received legal advice that it was unlawful from her attorney. And later, in the context of this lawsuit, she received advice from the court that he was inclined, that the judge was inclined to agree that this was an invalid assignment and that he would set it aside. But then he then ordered her to show cause why he should do that if she didn't pay back the money, the $35,900 that she'd received. The jury had been waived. This was on cross motions for summary judgment, and it was up to Pamela Short at that time to present her case. She'd been ordered to show cause why she shouldn't have to return that money. She didn't. And now she's asking you to come up with a reason why she shouldn't have to give back the money. Let me ask you this. First of all, those anti-assignment clauses are enforced. And what she did, she had no power to assign. And so really that assignment is void. All right. And then Singer coming around. How did Singer find out about her? She picked up the first payment that she had assigned. How did Singer find out about this lady? How did they know how to approach her? In the record, she called them. She called them over a two-year period. She called them. All right. So now Singer makes a deal with her. All right. And that deal, as far as I'm concerned, is against public policy. Because the Congress of the United States set up this whole structure of structured settlements to see to it that people like Mrs. Short didn't just squander settlement money if they got it in a lump sum. We all know that as lawyers. Client gets a lump sum. They don't know how to deal with money. The first thing they do is they go out and buy themselves a big camper. All their relatives come around and borrow money. In a year, they're broke. I mean, her settlement here, the gross figure was a million and a half, wasn't it? A little over that. A lot of money, yeah. So Congress set this up to protect people against themselves. You know, a fool and his money are soon parted. That's behind this. And then Congress set up an elaborate scheme of income tax benefits, right? The Congress set up the scheme. No. Congress set up the scheme after this. Well, but I'm just talking about they may have missed some of these things. You mean to tell me when she got her structure settlement that those tax advantages weren't there? Are you telling me that? I have no idea, Your Honor. I have no idea. They've been on the books for years and years and years. And they're there to protect people. And I've got it all right here. And Mrs. Short, she doesn't pay income tax on what she gets, right? And the carrier that writes the policy, they get a tax advantage. Now, if it's assigned and goes over now, then your client has to pay 40 percent of that factoring element that's in there. You know about that, don't you? No. Well, I'll give you a whole lecture on it if you want it. I've got it right here. I suspect that I've actually read it and not retained it even in the past. But our point was that. I mean, Singer's out of this business, right? Yes. They're gone. They know that they've made their last raid, so to speak, right? They're federally out of the business. They quit, you know. So our point, Your Honor, is simply that Pamela Short was given the option of addressing the inequities of the situation and did not. She was given the option. She was ordered to show cause why the judge should not order as he ordered, and she did not respond. Yeah, but if the judge was wrong, that's what we're here about today. That's correct. It doesn't matter whether she, what she did. The question before us is should the judge, whether she would agree to it or not, have ordered her to turn back that money as a condition of rescinding the or avoiding or somehow or another avoiding getting out of the contract. If the judge did, if that's what the judge did, that's the legal issue we have to determine. Or if he should have ordered her to give back what was left of it or if he had ordered or if she had suggested any other alternative. That's what we're to consider, I think. She said, no, I want it all. It's all or nothing. And so he said, okay, it's all. But he's got to be right on the law. That's right. Now, the other thing, it seems to me, is Judge Pragerson was getting at. My analogy to the to the minor, although I know I was advised in law school, analogies are a shortcut to thinking. But anyway, we'll go along with the analogy, if you will, for a little bit that you have. If you had the minor, you know, you knew he was a minor all along. And you gave him the Picasso in exchange for these future payments. And then he avoided the contract, said, no, I'm going to tell the obligor to pay me. And then you say, well, what about the Picasso? We get the Picasso back. Well, you probably have to. He's got the Picasso. But if it was money you gave him and he spent all the money, what are you going to do to the minor then? Get a guardian ad litem appointed for him and sue him to get the money back? Or how are you going to get the money back? Maybe a court might say, well, implying the equities of the situation, here's Singer that knew what they were doing. They were bargaining with someone who was precluded by the contract from making this very deal. Not unlike spendthrift provisions in a trust. And they went ahead anyway. And so they took their chances. And whether they get the money back or not, it was a void assignment. That's all they got. They got nothing. That's essentially what the court held when he applied the doctrine of equitable estoppel at first. The first time he took a thing at it, he looked at the equities of both sides and he said Singer knew what it was getting into. We assume that it knew the law better than she did. And it knew that the waiver was probably ineffective. Then when she wouldn't give back the money, he went, he abandoned and expressly abandoned the doctrine of equitable estoppel and went to the doctrine of quasi-estoppel where you looked at the behavior of the individual who's refusing to give back the money that she conceded in court she has in the bank. Okay. I think I get your argument now. Or most of which. Let me ask you this. If this court were to take an approach that she didn't have the power to assign it and therefore it was void, have you ever had the opportunity to brief that issue under Idaho law? That was the initial issue that we briefed. And the court held that she stopped to address that issue. That if it would have been another party, it would have been it would have been invalid. The assignment would have been invalid if another party was bringing the case. But in view of her refusal to either give back the money or come up with a reason why it would be inequitable for him to for the judge to order her to give back the money, she was a stop to reach that issue. He very clearly indicated where he was going to come out on that precise issue and he was going to she was going to agree with your argument. I mean, assuming this assignment is void. She didn't have the power to make it. Now, how does this equitable estoppel doctrine trump that? You've got an agreement that's void right from the beginning. So what's equitable estoppel got to do with it? She can't cheat. I mean, what you have, you know, you have unjust enrichment. You have revision. Those are the cases. It was it was it was unlawful for the city to annex some land outside of the city of Middleton. It was unlawful. The Supreme Court said, but you can't assert that unlawfulness because you took advantage of that annexation to increase the value of your property. That's void from the beginning. They said you can't get into it. You don't reach that question. What? You don't reach that question. Was it void or voidable what the city did? Was it? I don't know. Here it was void. We know that. You know, I think I'm finally getting your argument now, Mr. Neiman. It takes a while. Well, I'm sorry. But I think I'm finally getting it. If this court were to say, OK, this is short, what should have happened here, what should happen is you should give back the thirty five nine. The contract's void. Singer doesn't get any of these payments at all. The attorney fee. I don't know who's the prevailing party. Put that aside for a minute. But you've got to give back the thirty five nine and then you're going to get all the future payments. And we enter a judgment like that. And then Mrs. Short thumbs her nose at that and says, I'm not going to give back the thirty five nine. And where does that leave Singer? Well, it leaves Singer with entitlement to the payments. That's correct. And you're telling me that's already happened. We're beyond that. That already happened in the in the district court. That's precisely what I'm arguing. I'm sorry for not. Why should we tell her again? Well, think about that. That was a dumb decision. We'll give you another chance to make that decision. And we're not talking. She was listening to her attorney. You know, she might listen to the court. See, I don't I don't know, Your Honor. I've got a daughter that that she wouldn't listen to either. I'm sure it happens. From your perspective, what sort of authority would the court have to do that? Or are we just bound by either? I think I don't. Affirming the judgment or reversing the judgment. I think that's where you are, Your Honor. I think that Judge Rafiti gave her every opportunity to make that argument, to make proposals, to come up with some argument why his proposed order was inequitable, and she did not do it. She simply said, I want it all. And that's where she stood. And her position dug her into a very, very deep hole. And he made it very clear that he didn't want her to go there. And he gave her every opportunity not to dig herself into that hole. And she she said, I'm going to dig myself into the hole and then I'm going to go up the Ninth Circuit. And I'm going to throw myself on the mercy of the court for being in this deep hole. Look, let me ask you this. Just going back. The first the first amount of money that Singer turned over to her was how much? Thirty five thousand nine hundred dollars. When was that? That was the first payment when she first made the deal. And I can't I can't remember the date. Nineteen ninety eight. Nineteen ninety eight. How much was that again? Thirty five. Thirty five thousand nine hundred dollars. And then. Within three years. On March the 30th, 2001. How much of that thirty three thousand was Singer going to get? I think that was that was Singer's share. Getting the whole thing. She was. Yes. You were getting all of your client. Yes. Oh, all right. So forget about interest. I think the rates were low then. Actually, they were very high. They were very high at that time. My recollection is that they were very high. But I may just be thinking my credit card where they're all anyway. So you're going to get paid back. If you took that thirty three and get back all but about. Maybe about two thousand. A little less than seven hundred of the principal. And then you come to you go. You go out to March of 2006. You get 60,000. And you go to two. I think she got two thirds of the 60,000. OK. You got to 60,000 was to 11. Oh, on March the 6th, 2006. How much did you get out of the forty six thousand six. That's forty six. That's the forty six. I'm sorry. That's. So they got that acting unconscionably and maybe your client is acting unconscionably. Judge Rafiti in the when he was addressing equitable estoppel was not going to was not going to give. Sing of the benefit of this, this deal, because he said they went in with their eyes open when he applied the doctrine of course, I estoppel he said that she is going in with her eyes open on her refusal to just give back the money and walk away from this deal or at least come up with some reason why she shouldn't. And she did neither. She just. If I were to articulate your argument in the best light, it would be that she was given every opportunity, did not do that. So you were forced to go ahead and continue. And she was advised of the risks of that. And at that point, you became the prevailing party on the quasi estoppel. And she became responsible for the attorney's fees. That's correct. Thank you. And then what about the other payments? Future get those. You're going to get one. What was it? Forty six thousand in March of 06. That's right. Then you get one more, don't you? After that. Yes. And then she gets total comes to 140. Total is 140. And then she gets the other 37 plus 24. The other 37 is what she said. There are 40 payments and she sold three of them. Thank you. Thank you. I think Mr. Niman and I disagree as to how much opportunity she had. But I think the record is what it is in that regard. And I don't know that she had. How can you be the prevailing party or how can you even say that they're not the prevailing party under these circumstances? They are the prevailing party for attorney's fees under these circumstances. If it's a commercial transaction, Judge Kelly, and I'm suggesting that even if they win, it wasn't the gravamen of the lawsuit that they won on was not a commercial transaction under idle law. That's how I look at the attorney's fee. You're not really making an equitable argument there. No, no. Just a legal argument under our attorney's fees. Go. The quasi estoppel applies. Did you know about these public policy issues? As far as structured settlements are concerned. Did you know about this? When we entered into the structured settlement? No. When you were making all these deals. I made no deals. I made no deals. When you entered into it. Entered into what deal, Judge Fredersen? I entered into no deal. Ms. Short did not have legal representation when she entered into this deal. She had no. This is a guileless, ignorant, uneducated, poor child who had not the benefit of great upbringing. And she was derelict and irresponsible. How old was she when this happened? Fifteen? With the injury? Yeah. She was eight. Eight? Eight. Eight years old. She was eight years old and she's still probably eight. She entered into this deal with Singer Finance and Mr. Nye was absolutely correct. She called them. She saw an ad on the TV. She called them. She didn't talk to her lawyer. I've represented her for years. She never called a lawyer. She never did anything. In 2001, the payment came and the payment came and she started spending part of it. And then we get a call from Singer Finance appropriately saying, where's our money? That's the first time the lawyer knew that she had entered into any of this deal. And that's why when Judge Rafiti asked us why, why shouldn't she have to return the money? Why? Show cause why. We took advantage of that opportunity. And I looked at Idaho law and I suggested to him and I suggest to this court that Judge Lansing, in her formulation of what is quasi-estoppel in Idaho, she said in the Magic Valley case, Magic Valley truck brokers case, and I think it's absolutely on point, quasi-estoppel applies when a person asserts a claim of position inconsistent with the position previously taken with knowledge of the facts and of his or her rights to the detriment of the person seeking application of the doctrine. And I assert and I would assure you that this child, even today a child, didn't enter into any agreement with full knowledge of the facts and of her, his and her rights. And that's the reason why I suggest that the doctrine of quasi-estoppel, which is, this court knows, is a last gasp effort to reach equity, shouldn't apply in this case. And that's why, as between the two parties, weighing the equities, weighing what is or is not unconscionable, I suggest that this company that knew what they were doing, exacted the exorbitant discount rate that they did, that as between the two of them, I don't have any trouble, and I like to think of myself as moral and decent as anybody else, I don't have any trouble suggesting to this court, or as I suggested to Judge Rafiti, when you weigh all that's at issue here between the two parties, is it unconscionable, that's an element of quasi-estoppel, is it unconscionable in these circumstances that this person received $35,900 that Singer Finance gave to her to exact $140,000? And I suggest that it isn't and couldn't be. Judge Rafiti said it was unconscionable of her not to return the money. He did. He says Short subsequently refused to return the consideration, even after the court tentatively ruled that she was legally entitled to rescind the agreement. In doing so, Short engaged in behavior which still comes before specifically rebuked in Coffman. And? No, that's not true. He did that. He did that. And I have great respect for Judge Rafiti in that regard. But he did it without a record. He did it without that weighing of the balancing. He didn't have her. He had no weighing of the two parties, whether it was unconscionable as between the two of them, as Idaho law requires. It didn't pass his spell test. And I understand that. At first blush, it doesn't pass most of us's. I understand your argument better now, you know. Well, maybe if I could say. That, you know, she was injured at 18. At 8, Your Honor. 8. I mean 8. I'm sorry. 8. 8. Yeah. 8. And, you know, and that's all right. She got the money, you know. And so maybe if she doesn't give it back, that's not a nice thing to do. But on the other hand, these people were out to take her for a big ride, too, you know. That's your argument, right? In my argument. They were out to stick it to her. And that's why I think the risk. So, you know, they're bad people, too. And so she ought to keep the money. And if the interest rate, the discount rate had been what it was in 1998, 4.5%, 5%, well, I could have, personally, I could have a lot more sympathy with them than the discount rate that they exacted. And I think that some courts have suggested that's part of the cost of doing business. And that's why they do it. That discount rate was what, 18%? I didn't calculate it. A friend of mine looked at it, and he said it was well over 20. Go to the bank, you know. Call them up. They'll tell you. Well, you can, but. And, you know, we have, certainly, we know that this legislation was there to protect people. Now, Max Backus, who was a co-sponsor of the original tax legislation, says, I now find that all this careful planning and long-term financial security for the victim and his or her family can be unraveled in an instant by a factoring company offering a quick cash at a steep discount. What happens next month or next year when the lump sum from the factoring company is gone and the stream for payments for future financial support is no longer coming in? These structured settlement factoring transactions place the injured victim in the very predicament that the structured settlement was intended to avoid. That's Senator Backus from Montana. I mean, the Congressional record, you get all those things out of them. So, anyway. And that is precisely what happened in this case. She sold her stream of income at a significantly discounted rate to her disadvantage. Thank you, Your Honors. The matter will stand submitted.
judges: Pregerson, Thompson, Callahan